I represent the appellant Zeng. I was also the second chair of the jury trials below. Issues on this appeal are 1. whether the district court erred in its legal conclusions and its underlying findings affect in its decisions on Zeng's motion to suppress and his rule 29 and rule 33 motions. And 2. whether the government's use of racial stereotypes at trial violated Zeng's due process rights. Your Honor, I believe the parties wouldn't be here arguing whether Zeng understood the Miranda waiver and consent to search forms if the government agent simply asked whether he understood the text in these forms. Well, no. He did a lot more than that. He was much more deliberate, as I understood it, took him line by line. And at each turn, when given the opportunity, Mr. Zeng informed the agents that he understood. I don't think the transcript shows that he indicated he understood. He simply did not ask questions. So without the audio recording, I think it means he was silent. But why isn't this a credibility finding for the district judge? I mean, the judge heard from the officers who were involved and the judge credited them. I think the issue is not the credibility of the government witnesses. The issue is whether Zeng understood. I understand that. But they were with him and they said that to them it appeared that he understood. Correct. So why couldn't that be enough for the district judge? Because it is credible that the government witnesses themselves subjectively believe that he understood. But what my experts provided was the information as to why he did not have the capacity to understand the text in the forms. And the district court judge accorded those expert opinions not no weight but significantly less weight because they were not able to show that their method of determining his intellectual disability and determining the effect of that disability on his English language, his ability to understand or comprehend English, was a reliable method. In fact, they'd never been qualified as experts before. Why wasn't the district court judge entitled to do that? The issue there is that the attacks, the questions that the district court judge raised, were not based on any scientific basis as to why the experts' methods themselves were not reliable. What is the basis for the district court judge? The judge says that the opinions being offered by the experts themselves are not scientific, right, that the experts are relying on records from back when he was in school and also this test that's supposed to measure proficiency in the workplace and nothing that's really focused on whether he understood this particular form in this particular context, right? That seems like a reasonable argument. Why is that not reasonable for the district judge to? I think your question as to whether the experts should rely on those records to determine the linguistic capacity of Zheng, and this is something that you have to look at whether or not the experts' basis for looking at those records are reasonable, and the district court judge's questioning is not based on any, I think it's based on a presumption and attacking. So Zheng speaks English, right, and he's been in the, he went to high school here. He went to high school as a special ed student. He is functional, and so it's possible that he understood this form, and you're arguing that maybe he didn't understand the form, but the experts are only looking at records from back when he was in high school, but the district court, I think, was pretty persuaded by the fact that the experts didn't say anything specifically connecting his mental deficiencies to the understanding of this form in this particular context. Well, if you look at experts on Silverstein's report, her opinion is based on the fact that, look, you have these psych evaluation and all these IEP records, and stating that he does not have that capacity. He has a second-grade reading ability, and that on Silverstein did a word evaluation of the forms, and she said that's an eighth-grade readability. And so, I mean, I think that the experts, and this was acknowledged by the district court judge, did seem to cast doubt on his ability to understand even those forms at issue here, but why are you asking us to reevaluate the district court judge's determination? The district court judge here had a hearing, heard from, as Judge Radji pointed out, the border patrol agents who disputed more or less what you're saying, which is they said, we asked him if he felt comfortable speaking in English, and this is in the joint appendix, and he said yes. And the district court judge also evaluated and heard from the experts, which is not always the case, and determined, you know what, they're not giving me enough compared to what the border patrol agents have given me. Why should we reevaluate that? I think the government witness, Agent Havens, himself said, just because you can converse in English, does not mean you have that capacity to read and listen. The argument for us, though, has to be that the judge was compelled to find that he was not competent, because if the fact that you have a colorable argument isn't good enough, you have to convince us that as a matter of law, the judge was obliged to find him not competent. And I'm not sure what your argument to us leading to that conclusion is. Your Honor, my interpretation of the Miranda v. Arizona says that if the accused is silent, and in my reading of the transcript, he was silent. He did not raise questions. And as a matter of law, under Miranda, the Supreme Court says that that is not enough. It doesn't say that if he doesn't ask questions, it's not enough. Okay. Thank you. Okay. I'm out of time. There are a lot of issues. Will you reserve two minutes for rebuttal? And I know that you wanted to address the prosecutorial issue, but why don't we hear from the government and then we'll hear from you. Thank you, Your Honor. Thank you. Good morning, Your Honors. Rajiv Dosanjh for the government. I will, in light of the Court's questions, I will move directly to the issue that I suspect will be raised on rebuttal, which is the sufficiency of the evidence and the issue of the claim of prosecutorial misconduct. I think here the totality of the circumstances proven at trial showed that Zhang knew or was aware of the high probability that the two passengers he transported had crossed the border from Canada and had done so illegally. We go through the evidence in our brief, but very quickly, the pickup was arranged from a Toronto, Canada number. The final rendezvous was courted by a number from China. The pickup spot was only a mile away from the Canadian border. Mr. Zhang had driven there with GPS and likely knew where he was going and where on the map the Bears' Den was. He's a professional driver. The drop-off arrangement showed that the passengers had been transported to the Bears' Den from somewhere else. Mr. Zhang waited for about two hours for the passengers to arrive. The person coordinating the transfer confirmed by phone that Mr. Zhang was at the pickup spot, but then Mr. Zhang and his companions waited for another hour, which showed that the passengers were likely traveling from a distant location. Combining all those things, I think the jury was entitled to find, beyond a reasonable doubt, that Mr. Zhang knew or should have been aware that the passengers were coming in from Canada. In addition, the facts showed that they had entered illegally. The whole arrangement itself was highly unusual. To call a New York City livery driver, to drive all night to within a mile of the border, wait two hours, coordinate a transfer between cars, then drive immediately all the way back, that is unusual enough to suggest that the purpose here was to minimize the amount of time that the passengers spent in this area. The transfer was arranged and the calls were made so that Zhang was ready and waiting to go. The purpose, again, was to prevent the passengers from staying in the area very long. They had no luggage. They jumped into Mr. Zhang's van without a word. Mr. Zhang's friends testified that the passengers appeared anxious. Mr. Zhang told the friends not to interact with the passengers, again, which indicates he did not want the details of their trip to be verbalized  Again, Mr. Zhang went... At the same time, the other people in the car did try to engage them. It seems to me that, does that suggest that they were oblivious, given all the other circumstances around the transfer? Like if they said, well, why aren't they being talkative? It does sort of suggest they didn't really know exactly what was going on, doesn't it? Perhaps, Your Honor, but I think Mr. Zhang was in possession of the most information here. He was the one who had coordinated this pickup with other people. He asked these two friends to come along with him. They did. To them, I think they didn't have the full context, but I think even they knew that there was something odd, because they asked Mr. Zhang. They're not talking. So, again, these kind of... If they perhaps may have not been fully clued in on to where they were coming from, I think Mr. Zhang had the full picture. In addition, when he was stopped by the police officers or the agents, he stated that he was working for the Good Luck Car Service. As it was established at trial, that was actually not true. He had arranged this himself. He had gotten paid more money. He wouldn't have to pay a commission to his company. So, again, that adds to the idea that he was aware of the illegality of what was going on. As far as, again, turning then to the prosecutorial misconduct claim, the prosecutor did not argue that Zhang knew that his passengers were Chinese citizens, based solely on their appearance and language. Rather, he argued that it was an issue of credibility, that Zhang's denial that he could tell the passengers were Asian or Chinese was one more indication. He had put that in issue, so to speak, or in dispute on cross-examination. Is that correct? I'm sorry, Mr. Mr. Zhang was cross-examined? He was. And he had denied that he knew that they were understood or sensed that these people were Chinese. Right, or even Asian. Or more broadly. More broadly. And certainly my opposing counsel is correct that there is ambiguity in these terms, but when you combine it and look at it in context, I think it was the denial of even the knowledge that they were Asian in appearance, or especially when everyone else in the car was able to testify accurately that the two people who got in were Chinese. And, again, I think there was no objection to this at trial, so, again, he's under the plain error standard. He has to show this was a flagrant abuse. I mean, look, you agree that we need to police this very carefully. Very carefully, Your Honor, and I completely agree with that. I don't think that this comes anywhere near a flagrant abuse, and we cite some cases in our brief of arguments that did cross the line. This was nowhere near this. This was one comment out of a very solid circumstantial case. And, again, given his burden, I don't think that he can show that this was a flagrant abuse or the outcome of the trial would have been different had the prosecutor not referenced Mr. Zhang's own ethnic identity. And, again, you know, unless the Court has any other questions, I think we will rest on the arguments in the brief. I just wanted to point out one quick factual issue with regard to the waiver issue with the consent, the advice of rights form. When the agent testified at the suppression hearing that he told Zhang that if he understood the waiver, he should sign it, and Mr. Zhang then did, and he reread the last paragraph, which says, I understand this advice of rights. So I think Mr. Zhang's signing of that in that context was an affirmation that he understood. And, again, for all the reasons that the Court suggested, I think – There is no – I mean, Mr. Ang referred to a transcript. I took it of the exchange. Is there – No. Unfortunately, the office which he was taken to after he was arrested did not have the ability to have recording equipment. So there is no recording or transcript of the exchange. Does the evidence that the – or the expertise of the experts testified about his reading capacity tell us a lot about whether he understood – The district court said, well, to the extent that they were talking about this particular form, the experts asked, do you understand what right is, and he said it has to do with right and wrong, which is not right in context, but the district judge said, well, that's taking this particular word in isolation, and that's not particularly probative. So what do we get out of what the experts have to say? Brian, I think that the judge was correct in citing a number of problems with the experts' analysis. As the court pointed out, they relied on education records from 15 years prior. Zhang passed most of his classes in grades 9 and 10. The poor performance in grades 11 and 12 was due mostly to a lack of attendance. One expert, Ms. Silverstein, did not even interview Zhang in person. Neither expert considered the content of Zhang's interviews with the agents, as the havens had testified to didn't get any information about what he had said during the interview. And again, the – Did they have and was that information available? I think they could have, Your Honor, and again, they testified after the agent had testified as well, so they could have, again, addressed it then, but they made no effort to even get it from Zhang, what had happened in the interview. And the district court judge noted that. I mean, that was part of its analysis that led it to conclude that they had not sufficiently demonstrated reliability. That's right, Your Honor. And finally, the examination that he took, that was administered after he was arrested in the lead-up to the suppression hearing. So I think the court could have rightly considered that that was less probative of what his level of understanding was at the time. And our standard of review is clear error. Correct, Your Honor. Thank you. Unless there's other questions, we'll rest on our brief. Thank you. Mr. Eng. Your Honor, I'd just like to address the fact that the government witnesses themselves, Agent Rosario, who stopped Zhang's vehicle, and also Agent Havens, they could not determine the immigration status of the passengers unless they look at the immigration database. So on the one hand, government witnesses themselves said even they stopped the vehicle, they looked over the paperwork, the visas or passports of the passengers. They could not determine whether they're illegal aliens or not. And yet the government argued that Zhang should have known because of the international call numbers and the fact that location. But Zhang is not just stopping them at a traffic stop and looking at them on site, right? He has access to all of this information about the circumstances under which he was hired to come pick them up and that they snuck into the car, as well as the phone numbers and all of that, doesn't he? Well, you have to look at the two trips that he did take up to the Bear's Den restaurant. The first trip, he was sent to under the arrangements with the Good Luck Company. And so he knew of that location based on that first trip. The second trip, he got that call referred to by his friend. So where is the mens rea that he drove up there? And the trial transcript shows that he has taken other long-distance trips to Boston and other cities. So the question is— Did he not say that when he was questioned, he was working for a car service at that point? Was that not another reason for a jury to convict? This is the issue, right? He actually paid the Good Luck Car Company certain fees to get those jobs, whether he so-called, quote-unquote, worked for, it's up to interpretation, I would say. It's up to a jury to interpret whether he was lying. Did he pay a fee to the Good Luck Car Service for this trip? He pays weekly or monthly, a regular— But this trip wasn't arranged through the Good Luck Car Service. This was not. This was referred to by his friend. You're saying that there's a way to think of this trip as somehow being on the job for the Good Luck Car Service? Well, you know, job, as I think what the government agents understand, is that there's an employer-employee relationship. All right. But we have to assume the jury made findings consistent with the verdict, which means they rejected that story. Once you have that rejection, what's your argument? If they reject that, that's whether that constitutes the mens rea. Well, whether it contributes to it, that they found that he lied about it and that that was consciousness of guilt. I mean, it is — you'll agree it's an unusual trip to go from the city of New York to the Canadian border? I think the trial transcript shows that. So, you know, the jury is putting together these circumstances. And is there anything more you want us to be mindful of as we consider your sufficiency argument? I think even if — that's what you have to look at, I think. Even if that is a false statement, whether that really makes government's circumstantial case more plausible than not. Thank you very, very much. So that's the analysis. Thank you very much. We'll reserve the decision. Thank you for your time. And we'll hear argument next in Tortora v. City of New York, 19-1247.